[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11042
_____

D.C. Docket No. 3:11-cr-00024-MCR-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ERICK D. SMITH,
a.k.a. Erick Smith,
a.k.a. Tator,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(December 23, 2013)

Before TJOFLAT, MARCUS and RIPPLE,[*] Circuit Judges.

MARCUS, Circuit Judge:

Erick Smith seeks to overturn his conviction and 420-month sentence for, inter alia, conspiring to distribute and possess with intent to distribute cocaine.  On appeal, Smith principally claims that the Supreme Court's recent decision in United States v. Jones, 132 S. Ct. 945 (2012), requires us to reverse the denial of his motion to suppress, where the evidence in question was seized from his home pursuant to a warrant that was partially supported by warrantless GPS surveillance. We disagree.  When the officers in this case installed GPS trackers on Smith's vehicles without a warrant, they acted in reasonable reliance upon this Court's then-binding precedent.  Suppression of reliable, competent, and probative evidence is a last resort justified only where the benefits of deterrence outweigh the substantial social costs of exclusion.  Thus, as we see it, the good-faith exception to the exclusionary rule applies in this case, and the district court properly denied Smith's motion to suppress.  To rule otherwise would punish the officers for the errors of judges and would plainly fail to deter future Fourth Amendment violations.

Separately, Smith argues that the district court wrongfully admitted evidence of his two prior convictions for possession of cocaine, wrongfully refused to sever

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

his felon-in-possession charge, wrongfully considered acquitted conduct at the sentencing phase, and violated the Sixth Amendment "as applied." Our precedent rejects each of these arguments. Thus, after thorough review, we affirm both the conviction and the sentence.

I.

The relevant facts and procedural history are straightforward. Law enforcement officers drawn from federal and local agencies suspected that Smith transported cocaine from Foley, Alabama, for distribution and sale in Pensacola, Florida. During their investigation, the officers collected considerable evidence in support of their suspicions. On November 3, 2010, Special Agent Allen Davis of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) interviewed two cooperating defendants (Terrance Woods and "T.P.") at the Santa Rosa County Jail. Both of them positively identified photographs of Smith and said that Smith was the "primary source for cocaine" in the Lincoln Park area of Pensacola. Woods and T.P. also explained that Smith obtained his supply of cocaine from "Mexican males" in Foley, and both recalled that Smith "routinely" carried a firearm in furtherance of the drug trafficking operation. Additionally, Woods reported that he had seen Smith in possession of as much as ten kilograms of cocaine at one time. Woods also told Special Agent Davis that he and Smith twice

3

pooled their money for drug purchases, and that Smith sometimes provided the cocaine that Woods later sold.

On November 24 and 30, 2010, Special Agent Davis interviewed Smith's co-defendant, Telly Hill, after a search of Hill's residence uncovered 58.5 grams of cocaine base, 62.2 grams of cocaine hydrochloride, and over $2,600 in cash. During those interviews, Hill positively identified a photograph of Smith and stated that Smith supplied the cocaine powder from which Hill manufactured the cocaine base found in his home. Hill also told Special Agent Davis that Smith was the primary source of cocaine for the Lincoln Park and Ensley areas of Pensacola, and that Smith obtained his supply of cocaine from "Mexican males" in Foley. Moreover, Hill said that he had known Smith for four years and had been purchasing cocaine from Smith for over a year. According to Hill, Smith sold Hill cocaine, "typical[ly]" half of a kilogram, at least once and usually twice a week. Finally, Hill noted that Smith used various vehicles in the course of his drug-trafficking operation, including a Volvo, a white Chevrolet pick-up truck, and a red Dodge Magnum.

On December 26, 2010, Special Agent Davis obtained records from the Florida Driver and Vehicle Information Database and the Escambia County Property Tax Collector's Office. The records reported that Smith received a 2002 white Chevrolet pick-up truck on November 18, 2009, as a gift from Brenda Gail

4

Scott, who paid $10,940 in cash for the vehicle a few months earlier. The records also indicated that Shameka Brooks, Erick Smith's sister, purchased the 2005 red Dodge Magnum for $12,299 in cash on October 14, 2010. Special Agent Davis noted that Brooks spent more money at that time on the Magnum and other vehicles than she earned through her employment of record. Finally, Special Agent Davis discovered that Smith bought a 2004 blue Ford Mustang for $5,070 in cash on August 20, 2010. Smith filed no personal income tax returns from 2008 to 2010.

After collecting this evidence, but without seeking a warrant, the officers installed GPS trackers on two of Smith's vehicles. Special Agent Davis installed the first device on the white Chevrolet truck on January 6, 2011, while the vehicle sat in a parking lot off a public road. Detective Matthew Coverdale of the Pensacola Police Department installed the second device on a Toyota Camry rental car on January 10, 2011, while the second vehicle was similarly parked in a lot off a public road. Until the officers learned on February 5, 2011 that Smith had discovered one of the trackers, law enforcement officers relied on the GPS devices to monitor Smith's movements in Pensacola, Biloxi, and Foley. In addition to facilitating more effective visual surveillance, the trackers also reported that Smith made several trips to a location identified by a confidential informant as a "stash house."

5

On April 12, 2011, the officers asked a federal magistrate judge to issue a warrant to search Smith's residence at 8101 Tippin Avenue in Pensacola. The affidavit in support of the warrant application recited all of this evidence, including the locational information from the GPS trackers regarding Smith's travels in Pensacola, Biloxi, and Foley, as well as his visits to the alleged "stash house." The warrant was granted, and the officers conducted a search of Smith's apartment on April 14, 2011. In Smith's residence, they discovered nearly ten thousand dollars in cash, an operable Sundance Industries .25 caliber handgun, a disposable cell phone with 19 recent calls to a co-defendant whom law enforcement also suspected of drug trafficking, a small quantity of marijuana, and digital media seized from Smith's computer and camera.

On May 17, 2011, a federal grand jury returned a five-count superseding indictment against Smith, Hill, and a third co-defendant, Ismael A. Rodrigues. Smith was charged with: (1) conspiring to distribute and possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; (2) using, carrying, or possessing a firearm in furtherance of the drug crime, in violation of 18 U.S.C. § 924(c); (3) possessing a firearm in interstate commerce as a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and (4 and 5) two counts of money laundering.

6

After the indictment, Smith filed three relevant pretrial motions.  First, he moved to suppress all of the evidence that was seized from his residence.[1] According to Smith, the search was illegal because the government lacked probable cause to search his home -- the warrant notwithstanding.  Smith claimed that the government showed "no probable cause which established any ties to criminal activity," and failed to demonstrate a "nexus of criminal activity to connect criminal activity to the residence."  Notably, Smith's arguments did not address the government's warrantless use of GPS trackers.  Indeed, it was only in his Rule 29 motion for acquittal that Smith first raised that objection, which he later reiterated at sentencing.

The district court denied Smith's motion to suppress for two reasons.  First, the court found that the warrant affidavit established probable cause to search the residence because it articulated a fair probability that relevant evidence would be found there.  The court explained that the affidavit recited (1) statements from multiple cooperating witnesses who all confirmed that Smith led a cocaine distribution operation; (2) financial documentation that corroborated the suspicion that Smith led an organization that "procur[ed] illegal funds"; and (3) information from surveillance operations that tied Smith to suspected "stash houses" and

---

[1] In addition to securing a warrant to search Smith's residence, the government also applied for and obtained a warrant to search one of Smith's suspected "stash houses."  Smith moved to suppress all evidence seized from that second address.  But because the government said it did not intend to introduce any evidence from the search of the second property, the district court did not consider Smith's motion as to that property and that search is not at issue in this appeal.

known drug offenders.  The court also noted that the issuing judge was justified in considering Smith's criminal history.  Finally, the trial court concluded that the officers had shown a sufficient "nexus" to support a finding of probable cause.  The court offered four reasons: Smith listed the apartment as his residence in the Florida Driver and Vehicle Database; Smith's suspected crimes took place in close proximity to his residence; known drug offenders frequented the residence; and the officers saw Smith traveling between the residence and the suspected "stash houses."  Thus, considering the "totality of these circumstances," the district court concluded that there was a fair probability that Smith stored drugs or proceeds from drug transactions at his residence.

Alternatively, under United States v. Leon, 468 U.S. 897, 922 (1984), the district court determined that the officers' reasonable reliance on the warrant would render the evidence admissible even if the warrant were not actually supported by probable cause.  According to the court, the record "provide[d] no basis for concluding" that the officers did anything but reasonably rely on the search warrant in executing the search.

Apart from his motion to suppress, Smith's appeal also implicates his pretrial motion to exclude evidence of his criminal history and his pretrial motion to sever his felon-in-possession charge.  Both motions aimed to prevent the jury from learning of Smith's past convictions for the possession of cocaine.  The

8

district court denied the first one, finding the convictions admissible under Federal Rule of Evidence 404(b) as probative of intent and not unduly prejudicial. Because the jury would learn of Smith's prior convictions at trial, regardless of whether Smith's felon-in-possession charge was severed, the court then also denied Smith's second motion as moot. In any case, the court also found that severance was not appropriate because all of the counts were sufficiently related for joinder.

Smith's trial took place early in August 2011. The government introduced several pieces of evidence that had been seized from Smith's home pursuant to the warrant. That evidence included the handgun that was found in a dresser in Smith's master bedroom, $9,988 in cash, information and call logs downloaded from a cell phone, a gold necklace, various casino club cards, a bill of sale for the Dodge Magnum, a small bundle of marijuana, and digital media seized from Smith's computer and camera. Some of the photos admitted into evidence depicted Smith in possession of what appeared to be cocaine. Several of the videos from Smith's computer and camera recorded Smith making statements that he "[was] shaking the Feds," that he had "finally hit six figures," that he had "20 bands straight across," and that he carried "a .44 mag" for his "self protection." The court also admitted a certified copy of Smith's 1999 State of Florida conviction for the possession of cocaine, as well as a certified copy of Smith's 2003 Florida conviction -- also for cocaine possession.

After hearing this and other evidence, the district court acquitted Smith on the money-laundering charges.  As for the underlying drug charge, however, the jury found Smith guilty of conspiring to distribute or possess with the intent to distribute 500 grams or more, but less than five kilograms, of cocaine.  The jury also convicted Smith of the felon-in-possession charge, but acquitted him of carrying a firearm in furtherance of the drug crime.

On August 18, 2011, Smith moved for judgment of acquittal and a new trial. In addition to reprising his earlier arguments, Smith's motion voiced for the first time a Fourth Amendment objection to the government's warrantless GPS surveillance.  In full, Smith's objection read: "In addition to the arguments previously raised regarding the insufficiency of the Affidavit in support of said search, the Defendant, through counsel, would assert that said search was additionally illegal based upon the recent case of U.S. v. Maynard, 615 F.3d 544 (D.C. Cir. 2010)."  In Maynard, the D.C. Circuit held that the warrantless use of a GPS tracker constituted an unreasonable Fourth Amendment search.  615 F.3d at 555.  The district court denied the motion, relying on the reasons contained in its prior orders and those stated orally during the trial.  The court did not address specifically Smith's Fourth Amendment objection to the warrantless use of GPS trackers.

10

The district court sentenced Smith to a within-Guidelines term of imprisonment of 420 months, finding that: (1) a base offense level of 36 was appropriate under U.S.S.G. § 2D1.1(c)(2), because the government had shown a drug weight of 56 kilograms by a preponderance of the evidence; (2) a two-level enhancement was appropriate under U.S.S.G. § 2D1.1(b)(1) because the government had established by a preponderance of the evidence that Smith possessed a firearm in connection with the drug offense; and (3) a further two-level enhancement was appropriate under U.S.S.G. § 3C1.1 because Smith committed perjury. With a criminal history category of VI, Smith's applicable Guidelines range was 360 months to life.

Smith timely filed this appeal.

## II.

At the heart of Smith's case is an appeal from the denial of his motion to suppress. Notably, in challenging that denial, Smith does not reprise the arguments he made before the district court. More specifically, he does not assert that the officers failed to establish probable cause or claim an insufficient nexus between his residence and his criminal activity. On appeal, Smith's argument is limited to the singular claim that the officers violated the Fourth Amendment when they searched his home pursuant to a warrant that relied at least in some measure upon information collected from warrantless GPS surveillance. Smith argues that

warrantless GPS searches are always unreasonable, that the search warrant was invalid, and that any seized evidence the warrant yielded should have been excluded as fruit of the poisonous tree.

When Smith initially moved to suppress, he did not raise a Fourth Amendment objection to the government's warrantless use of GPS trackers. Nevertheless, the government conceded at sentencing and again on appeal that Smith preserved the issue for our review. Smith did eventually raise the GPS argument before the district court -- albeit in the context of a Rule 29 motion. Smith repeated his GPS objection in greater detail at the sentencing hearing, where Smith's counsel also explained why she had chosen not to raise the GPS argument in the first place. In a colloquy with the district court, defense counsel candidly explained that, at the time the officers installed the trackers in this case, she believed that warrantless GPS surveillance simply "wasn't a problem" sufficient to merit suppression under then-binding Eleventh Circuit precedent. Under Federal Rule of Criminal Procedure 12(e), a district court may for good cause grant relief from a waiver of a Rule 12(b)(3) objection. See Fed. R. Crim. P. 12(e) ("A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides. For good cause, the court may grant relief from the waiver."). In this case, after engaging with Smith's counsel and hearing no objection from the government, the district

court sought to "make the record very clear to the Eleventh Circuit that [Smith's counsel] ha[d] at least raised the issue with [the district court] here and [the court was] passing on it." Indeed, the district court specifically asked that Mr. Smith not be punished because the GPS objection had not been properly raised. Thus, we also consider the argument preserved and proceed to address its merits.

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts de novo." United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011) (quoting United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000)). We may consider any evidence that appears in the record, not only the evidence presented at the suppression hearing. Id. Finally, we will construe all facts in the light most favorable to the prevailing party -- here, the government. Id.

"Exclusion is 'not a personal constitutional right.'" Davis v. United States, 131 S. Ct. 2419, 2426 (2011) (quoting Stone v. Powell, 428 U.S. 465, 486 (1976)). Although the Fourth Amendment expressly protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," the Constitution does not explain how courts ought to treat evidence seized in violation of that command. The exclusionary rule is thus "a 'prudential' doctrine . . . created by [the Supreme] Court to 'compel respect for the

13

constitutional guaranty.'" Id. at 2426 (citations omitted). In designing the exclusionary rule, the Court did not aim "to 'redress the injury' occasioned by an unconstitutional search"; rather, as the Supreme Court has "repeatedly held," the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." Id. (citation omitted). "[S]uppression is not an automatic consequence of a Fourth Amendment violation." Herring v. United States, 555 U.S. 135, 137 (2009). Instead, exclusion is a remedy of "last resort," justified only where the "deterrence benefits of suppression" outweigh the "substantial social costs" of "ignor[ing] reliable, trustworthy evidence bearing on guilt or innocence." Davis, 131 S. Ct. at 2427 (citations omitted).

In light of this important limitation, the suppression of competent and probative evidence would generally not be an appropriate remedy where a Fourth Amendment violation occurred despite a law enforcement officer's exercise of good faith. See, e.g., Leon, 468 U.S. at 922 (holding that exclusionary rule did not apply when police conducted search in "objectively reasonable reliance" on a warrant later held invalid); Illinois v. Krull, 480 U.S. 340, 349-50 (1987) (applying good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes); Arizona v. Evans, 514 U.S. 1, 14 (1995) (applying good-faith exception where police reasonably relied on erroneous information concerning an arrest warrant in database maintained by judicial employees); Herring, 555 U.S. at

14

147-48 (applying good-faith exception where police mistakes resulted from "isolated negligence" by police employees, id. at 137, rather than from "systemic error or reckless disregard of constitutional requirements," id. at 147).  As the Supreme Court has recognized, excluding evidence in these good-faith cases "deters no police conduct and imposes substantial social costs." Davis, 131 S. Ct. at 2434.

In Davis, the Supreme Court extended the good-faith exception to embrace "searches conducted in objectively reasonable reliance on binding appellate precedent." Id. at 2423-24.  Suppression in such cases "would do nothing to deter police misconduct," id. at 2423, because police conduct is "not wrongful" when it is "in strict compliance with binding precedent." Id. at 2428-29.  Responsible officers learn "'what is required of them' under Fourth Amendment precedent" and take care to "conform their conduct to these rules." Id. at 2429 (quoting Hudson v. Michigan, 547 U.S. 586, 599 (2006)).  When binding precedent "specifically authorizes a particular police practice," moreover, officers "will and should use that tool to fulfill" their public duties.  Id.  Indeed, applying the exclusionary rule in the face of such good-faith reliance would only deter "conscientious police work." Id.  Thus, even when a higher court subsequently overrules the precedent at issue in a given case, courts ought not to penalize the officer for the appellate court's error.  Id. at 2429.  "'[P]unish[ing] the errors of judges' is not the office of

15

the exclusionary rule," and when the police act in reasonable reliance on then-binding appellate precedent, the error of judges is the only constitutional mistake. Id. at 2428 (second alteration in original) (quoting Leon, 468 U.S. at 916).

In asking us to reverse the denial of his motion to suppress, Smith invokes United States v. Jones, 132 S. Ct. 945, 949 (2012), which held -- after the events at issue in this case -- that for Fourth Amendment purposes officers conducted a "search" when they installed a GPS tracker on a suspect's vehicle. Although the Court concluded that such GPS searches implicate the Fourth Amendment, it had "no occasion to consider" whether a warrantless GPS search might ever be reasonable. 132 S. Ct. at 954. In asserting that the warrantless searches violated his Fourth Amendment rights in this case, and in claiming therefore that evidence seized in reliance on those searches should be suppressed, Smith would have us resolve the difficult constitutional question left open in Jones. We decline Smith's invitation, however, because even if the Fourth Amendment requires an officer to secure a warrant before installing a GPS tracker, the Davis good-faith exception plainly would suspend the operation of the exclusionary rule in this case.

The officers here undeniably relied on the same kind of then-binding, but subsequently overruled, appellate precedent that was at issue in Davis. When law enforcement officers attached the trackers in this case, in January 2011, our precedent specifically authorized officers to install "an electronic tracking device"

16

on a suspect's vehicle upon a showing of reasonable suspicion. United States v. Michael, 645 F.2d 252, 254 (5th Cir. 1981) (en banc).[2] Under Michael, the fact of trespass did not automatically trigger constitutional concerns. See id. at 258 n.14 ("That the beeper required the DEA agents to make a technical trespass unlike the pen register in Smith is not controlling. This slight physical intrusion is insignificant if it infringes no privacy interest."). Rather, our Fourth Amendment analysis turned largely on the notion that "an individual's expectation of privacy in his automobile is less than in other property." Id. at 257.

In United States v. Knotts, 460 U.S. 276, 281 (1983), decided shortly after Michael, the Supreme Court held that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Knotts therefore reached the same conclusion that the former Fifth's Circuit did in Michael: that the use of a beeper to track a suspect's movements on public roads involved "neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment." Id. at 285. Because the beeper at issue in Knotts had been concealed inside of a container that was later loaded onto the suspect's vehicle, however, Knotts had no occasion to consider for Fourth Amendment purposes the trespass involved in installing an electronic tracking

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. The former Fifth Circuit decided Michael on May 11, 1981.

17

device directly.  Consequently, <u>Knotts</u> left undisturbed the holding in <u>Michael</u> that that "slight physical intrusion" was "insignificant" for Fourth Amendment purposes.  645 F.2d at 258 n.14.

After the GPS searches at issue in this case, <u>Jones</u> distinguished <u>Knotts</u> and rejected much of the Fourth Amendment analysis contained in <u>Michael</u>.  In <u>Jones</u>, the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor a vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment.  132 S. Ct. at 949 (footnote omitted).  Contrary to the former Fifth Circuit's analysis in <u>Michael</u>, the Supreme Court explained that "the <u>Katz</u> reasonable-expectation-of-privacy test has been <u>added to</u>, not <u>substituted for</u>, the common-law trespassory test."  <u>Id.</u> at 952.  In installing the GPS device on Jones's vehicle, the government conducted a search because it "physically occupied private property for the purpose of obtaining information."  <u>Id.</u> at 949.

On the merits, the rule announced by the Supreme Court in <u>Jones</u> applies to Smith's case.  "A decision of [the Supreme] Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered," <u>United States v. Johnson</u>, 457 U.S. 537, 562 (1982), "with no exception for cases in which the new rule constitutes a 'clear break' with the past." <u>Griffith v. Kentucky</u>, 479 U.S. 314, 328 (1987).  "Final" in

18

this context refers to any "case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." Griffith, 479 U.S. at 321 n.6. Since Jones was decided after Smith's trial, but notably before the availability of appeal was exhausted, the Jones rule applies here. Under that rule, the officers in this case twice conducted warrantless searches that implicated Fourth Amendment interests when they installed GPS trackers on Smith's vehicles.

Nevertheless, even if Jones would have rendered the warrantless searches in this case unreasonable, the officers' good-faith reliance upon Michael renders exclusion inappropriate here. At the time of the GPS searches, Michael was binding precedent that clearly dictated the constitutionality of warrantless GPS surveillance. In 1981, an en banc panel of the former Fifth Circuit held that reasonable suspicion was the appropriate standard against which to measure the warrantless installation of an electronic tracking device on a suspect's vehicle. Michael, 645 F.2d at 257. A GPS tracker is an "electronic tracking device," and at the time the officers installed the trackers on Smith's vehicles, they had at least reasonable suspicion to believe Smith was engaged in criminal activity. In fact, Smith does not dispute on appeal that the officers had reasonable suspicion. But even if he had disputed that determination, the incriminating statements from Woods, T.P., and Hill, together with the discrepancy between the value of Smith's

19

vehicles and his declared income, provided "specific and articulable facts, together with rational inferences from those facts," that were sufficient "reasonably [to] warrant[] the agents in the belief" that Smith was involved in drug trafficking.  Id. at 257.[3]

Nevertheless, Smith asks us to distinguish Michael.  He points specifically to our insistence that, because the "justifications for the good-faith exception do not extend to situations in which police officers have interpreted ambiguous precedent," our precedent on a given point "must be unequivocal before we will suspend the exclusionary rule's operation."  United States v. Davis, 598 F.3d 1259, 1266-67 (11th Cir. 2010), aff'd Davis, 131 S. Ct. 2419.  Inasmuch as Michael involved a beeper, not a GPS tracking device, Smith submits that Michael did not "clearly dictate[] the constitutionality" of a GPS search supported only by reasonable suspicion.  Davis, 598 F.3d at 1267 n.10.

We think Smith asks us to draw too fine a distinction.  Because a GPS device is an "electronic tracking device," the officers in this case "followed the Eleventh Circuit's . . . precedent to the letter" when they installed the trackers on

---

[3] Indeed, even after completely excising the information derived from the warrantless search, Special Agent Davis's affidavit cleared the higher hurdle of establishing probable cause.  Under the "totality-of-the-circumstances," the remaining evidence still showed a "fair probability that contraband or evidence of a crime [would] be found in" Smith's residence.  United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  What's more, co-defendant Hill's statements may have been sufficient on their own to establish probable cause.  See Craig v. Singletary, 127 F.3d 1030, 1042, 1044-45 (11th Cir. 1997) (en banc) (recognizing that probable cause may be established by a co-defendant's unsworn confession that he and the suspect committed the crime).

Smith's vehicles with reasonable suspicion. Davis, 131 S. Ct. at 2428. In fact, rather than limiting the analysis to beepers, every opinion in Michael referred to electronic surveillance in general terms. The majority opinion never discussed the precise technological capabilities of beepers, and in fact the very first sentence of the opinion characterized the beeper as an "electronic tracking device" before parenthetically identifying it as a beeper. 645 F.2d at 254. The special concurrence and both dissents similarly described the beeper in general terms. See id. at 259 (Clark, J., specially concurring) ("I also concur in [the majority's] holding that no invasion of constitutionally protected privacy occurred when police with the degree of reasonable suspicion present here attached an electronic tracking device to [defendants'] van.") (emphasis added); id. at 260 (Tate, J., dissenting) (faulting the majority for permitting "a trespass that enables [officers] to maintain continuous electronic surveillance over [the defendant's] movements") (emphasis added); id. at 271 (Godbold, J., dissenting) ("The officers, by attaching the electronic device, made the van into a mechanism for reporting to the government its own location and necessarily the location of persons occupying it.") (emphasis added).

To the extent that beepers and GPS devices employ distinct technologies and collect different quantities of locational data, nothing in Michael required the officers to consider the quality or quantity of information collected by a tracking

21

device.[4]  Until Jones, nothing in Supreme Court jurisprudence mandated that sort of inquiry, either.  Instead, the operative facts in Michael closely mirrored the facts of the instant case.  As here, Michael involved the (1) physical installation (2) in a public place (3) on a suspect's vehicle (4) of a device that would track that vehicle's position (5) on public roads.

On those facts, Michael's Fourth Amendment analysis distilled to three points.  First, the trespassory aspect of installation was not dispositive -- and, in any event, installing a tracking device on the exterior of a vehicle in a public place "was much less intrusive than the typical stop and frisk."  645 F.2d at 258.  Second, because the defendant had no reasonable expectation of privacy in his vehicle's movements on public roads, the warrantless installation of a device to track those movements did not trigger any Fourth Amendment concerns.  Id. at 257-58.  And, third, the government's interest in eliminating illegal drug manufacture was a "persuasive reason to permit this minimally intrusive practice."

---

[4] The dissenting opinions in Michael construed the majority's holding broadly enough to dictate the constitutionality of continuous electronic surveillance for an indefinite period of time.  See Michael, 645 F.2d at 260 (Tate, J., dissenting) ("Sitting en banc in mini-convention of twenty-four appellate judges, a majority of our court has decided that an individual living under our Constitution has no reasonable expectation of privacy such as would protect him from a trespass upon his property by governmental agents, a trespass that enables them to maintain continuous electronic surveillance over his movements twenty-four hours per day continuously and indefinitely.") (emphasis added); id., 645 F.2d at 272 (Godbold, J., dissenting) ("We view with loathing totalitarian systems that require a person traveling from one place to another to check in with the police and report on his movements.  The majority treat as trivial the privacy interest against one's unwittingly but continuously making the same kind of report through an electronic device attached to the property by which he moves from place to place. I do not consider this trivial.") (emphasis added).

22

Id. at 259.  Applying the same analysis to the similar facts found in Smith's case, the same conclusion follows.  Special Agent Davis and Detective Coverdale installed the two GPS trackers on Smith's vehicles while those vehicles were parked in lots off a public road.  There is no allegation here that the government tracked Smith anywhere other than on public roads.  And although Smith was not indicted on drug-manufacturing charges, co-defendant Hill's statements gave the officers reason to suspect that the conspiracy involved both the distribution of cocaine and the conversion of powder cocaine to cocaine base.  The GPS search was thus motivated by the government's interest in eliminating both the manufacture and the distribution of illegal drugs.  To any reasonable officer, then, the three prongs of Michael's Fourth Amendment analysis dictated the constitutionality of the search here at issue.  In short, the agents relied reasonably on what was then binding appellate precedent.

In reaching this conclusion, we are supported by the Fifth Circuit's identical holding in its own post-Jones opinion construing Michael.  In United States v. Andres, 703 F.3d 828, 835 (5th Cir. 2013), the Fifth Circuit held that "[d]espite any possible technological differences between a 1981 'beeper' and the GPS device used in this case, the functionality is sufficiently similar that the agents' reliance on Michael to install a GPS device on [defendant's] truck, in light of the reasonable suspicion of drug trafficking, was objectively reasonable."  We think

23

that holding is plainly correct; indeed, we previously reached the same conclusion in one of our own unpublished opinions. See United States v. Smith, 387 F. App'x 918, 920-21 (11th Cir. 2010) ("In United States v. Michael, we held that the placement of an electronic tracking device on the exterior of the defendant's vehicle when it was parked in a public parking lot did not violate his Fourth Amendment rights. Smith's argument that the installation of the GPS device violated his Fourth Amendment rights fails because the Escalade was parked in a place easily accessible to the public and was reachable from a public thoroughfare. Smith had no reasonable expectation of privacy with respect to the exterior of the vehicle.") (citations omitted). These decisions do not constitute binding precedent, but they provide persuasive authority to support our conclusion that Michael unambiguously authorized the GPS searches at issue in this case.

Moreover, in addition to the Fifth Circuit in Andres, at least two other circuits have also applied the Davis good-faith exception where officers conducted warrantless GPS searches in reliance upon then-binding beeper precedent. See United States v. Sparks, 711 F.3d 58, 64-66 (1st Cir. 2013) (recognizing that the Davis good-faith exception only applies where then-binding precedent was "clear and well-settled," id. at 64, but nevertheless applying the exception where officers conducted warrantless GPS searches in reliance upon then-binding beeper cases establishing that "using a beeper to monitor a person's movements in a car on

24

public roads did not implicate the Fourth Amendment," and that "the trespass involved in attaching a beeper to a car was, by itself, so insignificant as to be essentially irrelevant for Fourth Amendment purposes," id. at 65); United States v. Pineda-Moreno, 688 F.3d 1087, 1090 (9th Cir. 2012) (applying the Davis good-faith exception where officers conducted warrantless GPS searches in reliance upon then-binding beeper cases establishing that "placing an electronic tracking device on the undercarriage of a car was neither a search nor a seizure under the Fourth Amendment," and that "the government does not violate the Fourth Amendment when it uses an electronic tracking device to monitor the movements of a car along public roads"). But see United States v. Katzin, 732 F.3d 187, 208 (3d Cir. 2013)

Finally, we note a wealth of persuasive authority suggesting that, before Jones, courts actually did recognize Michael as binding in the GPS context. Indeed, within this Circuit, by our count, every district court that has considered the question ultimately concluded that Michael clearly established the constitutionality of GPS searches supported only by reasonable suspicion. See United States v. Dooley, No. 1:11-CR-255-3-TWT, 2013 WL 2548969, at *2 (N.D. Ga. June 10, 2013) (citing Michael) ("Detective Duncan installed the GPS tracker on the Impala on March 15, 2011, before the Supreme Court's decision in United States v. Jones. Prior to Jones, the Eleventh Circuit had held that a warrant

25

was not required to install an electronic tracking device on the exterior of a vehicle parked in a public place . . . .") (citation omitted); United States v. Figueroa-Cruz, 914 F. Supp. 2d 1250, 1269 (N.D. Ala. 2012) (citing Michael) ("There is no question that as of September 20th, 2011 binding Eleventh Circuit precedent clearly established that the attachment of a 'beeper' tracking device to monitor the movement of a defendant's vehicle violated no constitutional right."); United States v. Lewis, No. 12-60011-CR, 2012 WL 4838889, at *2 n.1 (S.D. Fla. Oct. 10, 2012) (citing Michael) ("Prior to Jones, GPS tracking devices were treated as beepers in the Eleventh Circuit."); United States v. Nelson, No. CR612-005, 2012 WL 3052914, at *3 (S.D. Ga. July 25, 2012) (citing Michael) ("The record in this case establishes that when [an officer] installed the GPS device on [defendant's] vehicle he relied upon established FBI policy that conformed with binding Eleventh Circuit precedent."), report and recommendation adopted, No. CR612-005, 2012 WL 3835826 (S.D. Ga. Sept. 4, 2012); United States v. Rosas-Illescas, 872 F. Supp. 2d 1320, 1327 (N.D. Ala. 2012) (citing Michael) ("The good-faith exception applies here because at the time [an officer] used the GPS tracking device, binding Eleventh Circuit law allowed the use of such devices without a warrant."); United States v. Burton, 698 F. Supp. 2d 1303, 1307 (N.D. Fla. 2010) (citing Michael) ("It is clear that the Defendant's request for operation of the Fourth Amendment exclusionary rule because of law enforcement's use of a GPS

26

tracking device on the Defendant's vehicle to trace the Defendant's movements must be denied."). Just as in <u>Davis</u>, the issue here was not "unsettled" in this Circuit. 131 S. Ct. at 2435 (Sotomayor, J., concurring in the judgment). Instead, this constellation of decisions is altogether consistent with our conclusion that <u>Michael</u> established the constitutionality of warrantless GPS surveillance at the time the officers installed the trackers.

Thus, when law enforcement officers act "with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" <u>Davis</u>, 131 S. Ct. at 2427-28 (quoting <u>Leon</u>, 468 U.S. at 908 n.6, 909, 919 (1984)). "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" <u>Id.</u> at 2428 (alteration in original) (quoting <u>Herring</u>, 555 U.S. at 144). This is not a case of "deliberate," "reckless," "grossly negligent," or even negligent disregard for Fourth Amendment rights. <u>Id.</u> at 2427 (quoting <u>Herring</u>, 555 U.S. at 144); <u>see, e.g.</u>, <u>Weeks v. United States</u>, 232 U.S. 383 (1914) (finding reversible error where district court admitted evidence seized by officers who broke into defendant's home without a warrant, confiscated incriminating papers, then returned with a U.S. Marshal to confiscate still more material); <u>see also</u> <u>Herring</u>, 555 U.S. at 143 (construing <u>Weeks</u> as "a foundational exclusionary rule

case"); Mapp v. Ohio, 367 U.S. 643 (1961) (applying the exclusionary rule where officers forced open a door to Mapp's home, prevented her lawyer from entering, brandished a false warrant, forced Mapp into handcuffs, and canvassed the home for obscenity).

By contrast, the officers' conduct in this case "was in strict compliance with then-binding Circuit law and was not culpable in any way." Davis, 131 S. Ct. at 2428. Here, where Michael specifically authorized officers to install an electronic tracking device once they developed reasonable suspicion, we cannot discern "appreciable deterrence" that would justify excluding the competent and probative evidence seized from Smith's home. Id. at 2426 (quoting United States v. Janis, 428 U.S. 433, 454 (1976)). The officers in this case were not mistaken in relying upon Michael as binding precedent; rather, they reasonably relied upon precedent that was, itself, mistaken on the constitutional question. But, again, "'punish[ing] the errors of judges' is not the office of the exclusionary rule." Id. at 2429 (quoting Leon, 468 U.S. at 916). And "about all that exclusion would deter" in this case "is conscientious police work." Id. The good-faith exception to the exclusionary rule therefore fairly applies, and Smith's motion to suppress was properly denied.

III.

Apart from seeking reversal of the denial of his suppression motion, Smith also asks us to find that the district court committed a number of other errors in the course of the proceedings. We conclude that the court committed no such errors and accordingly affirm on each issue.

A.

First, Smith cites as error the district court's denial of his motion to exclude evidence of his two prior convictions for the possession of cocaine. He asserts that evidence of those convictions was unduly prejudicial and not probative of a material issue other than character, since the convictions occurred six and ten years before the charged offense, and since the prior convictions were for possession of -- not distribution of or possession with intent to distribute -- cocaine. Each of these arguments fails.

Federal Rule of Evidence 404(b) empowers courts to admit evidence of a defendant's other crimes when that evidence is used to prove, inter alia, the defendant's intent to commit the crime at issue. Rule 404(b) is a rule of inclusion, and "404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case." United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003) (quoting United States v. Perez-Tosta, 36 F.3d 1552, 1562 (11th Cir. 1994)). There is "[a]mple precedent . . . in this circuit finding that a not guilty plea in a drug conspiracy case . . . makes intent a material issue and

29

opens the door to admission of prior drug-related offenses as highly probative, and not overly prejudicial, evidence of a defendant's intent." United States v. Calderon, 127 F.3d 1314, 1332 (11th Cir. 1997). This may be true even where the prior conviction is many years old. See United States v. Lampley, 68 F.3d 1296, 1300 (11th Cir. 1995) (finding admissible evidence of approximately fifteen-year-old marijuana dealings); United States v. Pollock, 926 F.2d 1044, 1048 (11th Cir. 1991) (noting that courts have upheld the admission of rule 404(b) evidence regarding convictions that "occurred ten and thirteen years earlier than the charged offense"). Thus, as the district court found, evidence of Smith's prior convictions was not inadmissible simply because those convictions occurred six and ten years before the conduct at issue in Smith's August 2011 trial.

Our precedent similarly contradicts Smith's argument that evidence of his earlier possession convictions ought not to have been admitted as probative of his later intent to distribute. This Court has specifically rejected that argument. See United States v. Butler, 102 F.3d 1191, 1196 (11th Cir. 1997) ("[T]he logical extension of our current jurisprudence is to admit evidence of prior personal drug use to prove intent in a subsequent prosecution for distribution of narcotics."). Prior convictions may be probative of intent where, as here, the prior conviction was for possession of the same drug involved in the instant conspiracy. See United States v. Green, 40 F.3d 1167, 1174 (11th Cir. 1994) ("The challenged similar act

[possession of cocaine] involved the same mental state as the charged crime [possession with intent to distribute cocaine] because both incidents involved possession of the same illicit drug, cocaine."). Thus, we have little difficulty in concluding that the district court did not abuse its discretion in denying Smith's motion to exclude evidence of his two prior convictions.

### B.

Smith also appeals from the denial of his motion to sever his felon-in-possession charge. Smith concedes, however, that if the district court did not err in denying his motion to exclude the evidence of his prior convictions, it did not err in denying his motion to sever. See United States v. Gabay, 923 F.2d 1536, 1540 (11th Cir. 1991) ("Unfair prejudice does not result when two offenses are joined if evidence admissible to prove each offense is also admissible to prove the other offense."). Because we find that the court did not err in admitting the evidence of Smith's prior convictions, we also necessarily find that the court properly denied Smith's motion to sever the felon-in-possession charge.

### C.

Smith's two remaining challenges concern the district court's conduct at the sentencing hearing. First, Smith claims that the court erred in considering acquitted conduct when it calculated and imposed his 420-month sentence. Smith

31

also argues that his sentence violated the Sixth Amendment "as applied." Again, our precedent disposes of both of these arguments.

First, Smith says that the district court impermissibly imposed a sentence calculated in partial reliance upon acquitted conduct. It is true that Smith's sentence was premised partially on facts that the jury did not find beyond a reasonable doubt, such as the applicable drug weight of fifty-six kilograms and Smith's use of a firearm in furtherance of the drug crime. But in United States v. Watts, 519 U.S. 148, 157 (1997), the Supreme Court held that a "verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." Smith does not argue that the government failed to establish sentencing facts by a preponderance of the evidence; rather, he says that Watts is no longer good law in light of the Supreme Court's later decisions in United States v. Booker, 543 U.S. 220 (2005), and Blakely v. Washington, 542 U.S. 296 (2004). Our precedent cannot square with Smith's readings of those cases. Indeed, even after Booker, we have held that "[s]entencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence." United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006) (quoting United States v. Hasson, 333 F.3d 1264, 1279 n.19 (11th Cir. 2003)).

Second, Smith claims that the district court violated the Sixth Amendment

"as applied."  This Court has never entertained an as-applied Sixth Amendment

challenge.[5]  Moreover, and frequently in the face of Sixth Amendment challenges,

we have repeatedly stated that sentencing courts may find by a preponderance of

the evidence all facts relevant to imposing a sentence below the statutory

maximum.  See, e.g., United States v. Ghertler, 605 F.3d 1256, 1268 (11th Cir.

2010) ("[O]ur precedent holds that district courts are permitted to find facts at

sentencing 'so long as the judicial factfinding does not increase the defendant's

sentence beyond the statutory maximum triggered by the facts conceded or found

by a jury beyond a reasonable doubt.'") (quoting United States v. Hunt, 459 F.3d

1180, 1182 (11th Cir. 2006)); United States v. Duncan, 400 F.3d 1297, 1302-03

(11th Cir. 2005) (rejecting argument that Sixth Amendment was violated where

facts found by court allowed sentence to be imposed in excess of Guidelines range

---

[5] We note in passing that our holding is consistent with the position taken by at least seven other circuits.  See United States v. Hernandez, 633 F.3d 370, 374 (5th Cir. 2011) (rejecting Sixth Amendment as-applied claim under circuit precedent); United States v. Treadwell, 593 F.3d 990, 1017-18 (9th Cir. 2010) (holding that Sixth Amendment as-applied claims are "too creative for the law as it stands") (quoting United States v. Benkahla, 530 F.3d 300, 312 (4th Cir. 2008)); United States v. Ashqar, 582 F.3d 819, 825 (7th Cir. 2009) ( "While [the as-applied Sixth Amendment] argument is not without its advocates, it is not the law."); United States v. White, 551 F.3d 381, 384 (6th Cir. 2008) (en banc) ("In the post-Booker world, the relevant statutory ceiling is no longer the Guidelines range but the maximum penalty authorized by the United States Code."); Benkahla, 530 F.3d at 312 (rejecting Sixth Amendment as-applied claim as "too creative for the law as it stands"); United States v. Redcorn, 528 F.3d 727, 745-46 (10th Cir. 2008) (rejecting as-applied Sixth Amendment challenge); United States v. Grier, 475 F.3d 556, 565 (3d Cir. 2007) (stating that a jury need only determine those facts "that increase the statutory maximum punishment"); United States v. Norman, 465 F. App'x 110, 121 (3d Cir. 2012) (explaining that, while Grier involved a Fifth Amendment challenge, it "left no room for doubt regarding our view of the Sixth Amendment [as-applied] question").

authorized solely by jury verdict).  It is undisputed that Smith's 420-month sentence is less than the statutory maximum (life imprisonment) that was authorized by the jury verdict.  Furthermore, Smith does not allege (nor could he) that the sentencing court took the Guidelines as mandatory instructions, rather than advisory in nature.  See Booker, 543 U.S. at 249-65 (Breyer, J.) (rendering the Guidelines advisory in order to avoid Sixth Amendment concerns).  In the context of sentencing determinations, the Sixth Amendment requires nothing more.  Smith's Sixth Amendment as-applied claim is foreclosed by our prior precedent.

Accordingly, we affirm both his conviction and the ensuing sentence.

**AFFIRMED**.